**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF NEW YORK**
_____

In re:

APPLERIDGE RETIREMENT
COMMUNITY, INC.,

                              Debtor.

_____

CASE NO. 08-22508

CHAPTER 11

DECISION & ORDER

## BACKGROUND

On September 29, 2008, Appleridge Retirement Community, Inc. (the "Debtor") filed a petition initiating a Chapter 11 case. On the Initial Schedules and Statements required to be filed by Section 521 and Rule 1007, the Debtor scheduled: (1) real property consisting of a building located at a campus address of 3005 Watkins Road in the Village of Horseheads, New York (the "Property"), valued by the Debtor at $5,000,000.00, subject to a claim by first mortgage holder Touchstone Asset Management ("Touchstone") in the amount of $19,017,751.59, of which $14,017,751.59 was unsecured; (2) a Payment in Lieu of Tax Agreement (the "PILOT Agreement"), dated May 1, 2001, with the Chemung County Industrial Development Agency (the "IDA"), listed on Schedule G, Executory Contracts and Unexpired Leases; and (3) PILOT Agreement claims by: (a) the IDA in the amount of $114,051.33; (b) the Horseheads Central School District in the amount of

$154,051.33; and (c) the Village of Horseheads in the amount of $220,000.00.

On March 3, 2009, the Debtor filed its Plan of Reorganization (the "Plan") and Disclosure Statement (the "Disclosure Statement"). In its classification of claims, the Plan and Disclosure Statement included "Class 4: PILOT Administrative Claims" (the "PILOT Class"), that consisted of all of the claims of the PILOT Agreement counter-parties (the "PILOT Agreement Counter-parties"),[1] for which the Plan provided that: (1) the Debtor modify the PILOT Agreement to provide for payment in full of the amounts due prior to filing its petition, totaling approximately $170,400.00; (2) the balance due under the PILOT Agreement be paid as set forth therein; and (3) the modified payments under the Plan be made in three equal annual installments of approximately $56,800.00, commencing on September 30, 2009, the time that the regular payments were required under the PILOT Agreement. The Plan further provided that the PILOT Class, as well as Class 1, the Mortgagee Secured Claim (the "Secured Class"), of which Touchstone is the sole member, and

---

[1] Concerning Class 4, PILOT Administrative Claims, the Plan included the following definitions: (1) PILOT Agreement: "certain Payment in Lieu of Taxes Agreement by and between Appleridge and the PILOT Agreement Counter-parties and dated as of May 1, 2001, including any amendments and extensions thereof;" (2) PILOT Agreement Claim: "the Claim held by the PILOT Agreement Counter-parties pursuant to the PILOT Agreement" (the "PILOT Agreement Claim"); and (3) PILOT Agreement Counter-parties: "the Chemung County Industrial Development Agency, the Village of Horseheads, the Town of Horseheads, Chemung County and the Horseheads School District." The Court adopts these definitions for purposes of the this Decision & Order.

Class 5, comprised of unsecured claims (the "Unsecured Class"), were the impaired classes, and therefore may vote to accept or reject the Plan.

The Disclosure Statement stated that the PILOT Agreement was renewed in November 2007 and that it "offers Appleridge a reduced payment obligation concerning applicable authorities, including the Village of Horseheads, the Town of Horseheads, Chemung County and the Horseheads School District." It also stated that the Debtor owes a total of $448,102.66 under the PILOT Agreement to the PILOT Agreement Counter-parties, and that as of the filing of its petition, the Debtor had arrears of approximately $170,400.00 due to the Horseheads School District, one of the PILOT Agreement Counter-parties.[2]

The Plan and Disclosure Statement further stated that the Unsecured Class, which included Touchstone's mortgage deficiency claim, was to be paid *pro rata* approximately five percent, without interest, in ten equal annual installments commencing on January 1, 2010.

---

[2]    The Debtor submitted the Affidavit of its President and Chief Executive Officer, Thomas Santobianco ("Santobianco") dated July 23, 2009 (the "Santobianco Affidavit"), indicating that the $488,102.66 that the Debtor scheduled as owing to the PILOT Agreement Counter-parties was owed through December 31, 2011, while the arrears as of filing was approximately $170,400.00.

The Court ordered that a hearing on the Disclosure Statement be held on April 30, 2009, which was adjourned at the request of the parties until May 28, 2009.

On April 22, 2009, the Office of the United States Trustee filed an Objection to the Disclosure Statement based upon numerous grounds, including that: (1) it may violate the absolute priority rule under Section 1129(b)(2)(B),[3] because unsecured and undersecured creditors were to receive only partial payment of their claims, while the Debtor would continue to retain all interests in property of the estate; and (2) the Disclosure Statement did not contain adequate information under Section

---

[3]     Section 1129(b)(2)(B) provides that:

(b)
        (2) For the purpose of this subsection, the condition that a plan be fair and equitable with respect to a class includes the following requirements:

        B) With respect to a class of unsecured claims-

                I) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or

                (ii) the holder of any claim or interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or interest any property, except that in a case in which the debtor is an individual, the debtor may retain property included in the estate under section 1115, subject to the requirements of subsection (a)(14) of this section.

11 U.S.C. § 1129 (2009).

1125(a)(1)[4] because: (a) the description of the PILOT Class payment schedule referred to payment pursuant to the PILOT Agreement, but it did not specify the payment terms included therein; and (b) the implementation of the Plan should be more detailed, particularly with regard to the PILOT Class, because it was impaired.

On May 19, 2009, Touchstone filed a Motion for the Appointment of a Trustee (the "Trustee Motion"), which requested that the Court remove Santobianco, along with the Debtor's Board of Directors (the "Board of Directors"), and replace them with a Trustee. Among its allegations, Touchstone asserted that a Trustee should be appointed

---

[4]      Section 1125(a)(1) provides that:

(a) In this section—

(1) "adequate information" means information of a kind,

and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit of additional information to creditors and other parties in interest, and the cost of providing additional information[.]

11 U.S.C. § 1125 (2009).

for cause, under Section 1104(a)(1),[5] and in the best interests of

creditors, under Section 1104(a)(2),[6] because: (1) Santobianco had

a conflict of interest in that he was the President and CEO of the

Debtor, as well as four other corporations, which together

comprised Bethany Village (the "Bethany Entities"); (2) several

members of the Board of Directors also sat on the Board of

Directors of the non-debtor Bethany Entities, making them insiders

---

[5]     Section 1104(a)(1) provides that:

(a)     At any time after the commencement of the case but
        before confirmation of a plan, on request of a party in
        interest or the United States trustee, and after notice
        and a hearing, the court shall order the appointment of
        a trustee—

        (1)     for cause, including fraud, dishonesty,
                incompetence, or gross mismanagement of the
                affairs of the debtor by current management,
                either before or after the commencement of the
                case, or similar cause, but not including the
                number of holders of securities of the debtor or
                the amount of assets or liabilities of the
                debtor[.]

11 U.S.C. § 1104 (2009).


[6]     Section 1104(a)(2) provides that:

(a)     At any time after the commencement of the case but
        before confirmation of a plan, on request of a party in
        interest or the United States trustee, and after notice
        and a hearing, the court shall order the appointment of
        a trustee—

        (2)     if such appointment is in the interests of
                creditors, any equity security holders, and other
                interests of the estate, without regard to the
                number of holders of securities of the debtor or
                the amount of assets or liabilities of the
                debtor[.]

11 U.S.C. § 1104 (2009).

**Page 6**

under Section 101(31)(B);[7] (3) Santobianco and the Board of Directors breached their fiduciary duty to the Debtor due to the lack of arms length dealing when approving the shared services program between the Debtor and the non-Debtor Bethany Entities; and (4) Santobianco and the Board of Directors grossly mismanaged the Debtor when they reinstated a debt of $6,936,170.00 owed to some of the non-debtor Bethany Entities, three days prior to the Debtor filing its petition, which had previously been forgiven.

On May 27, 2009, Touchstone also filed an Objection to the Debtor's Plan and Disclosure Statement, which alleged that the Plan was not feasible under Section 1129(a)(11),[8] because the Debtor's

---

[7]     Section 101(31)(B) provides that:

(31) The term "insider" includes—

(B) if the debtor is a corporation—

(I)    director of the debtor;

(ii)   officer of the debtor;

(iii)  person in control of the debtor;

(vi)   partnership in which the debtor is a general partner;

(iv)   general partner of the debtor; or

(v)    relative of a general partner, director, officer, or person in control of the debtor[.]

11 U.S.C. § 1104 (2009).

[8]     Section 1129(a)(11) provides that:

(a)  The court shall confirm a plan only if all of the following requirements are met:

financial projections were undermined by its disclaimers in the
Disclosure Statement that the projections may not be relied upon
and were not prepared in compliance with generally accepted
accounting principles. Touchstone also asserted that the
Disclosure Statement contained many material errors, including
failing to describe: (1) the details of the relationship between
the PILOT Agreement with the IDA and the Debtor's lease obligations
with the IDA, including why the PILOT Agreement is not an executory
contract or lease that must be assumed or rejected at the time of
confirmation, which would require that any arrears be cured at that
time; (2) whether the $170,000.00 owed to Horseheads School
District is a separate obligation from that owed under the PILOT
Agreement with the IDA; (3) Touchstone's potential election under
Section 1111(b);[9] (4) the details of the appraisal used for the

---

> (11) Confirmation of the plan is not likely to be
> followed by the liquidation, or the need for further
> financial reorganization, of the debtor or any successor
> to the debtor under the plan, unless such liquidation or
> reorganization is proposed in the plan.

11 U.S.C. § 1129 (2009).

    [9]    Section 1111(b) provides that:

> (b)
> > (1)
> > > (A) A claim secured by a lien on property of the
> > > estate shall be allowed or disallowed under
> > > section 502 of this title the same as if the
> > > holder of such claim had recourse against the
> > > debtor on account of such claim, whether or not
> > > such holder has such recourse, unless—
> > >
> > > (I) the class of which such claim is a part
> > > elects, by at least two-thirds in amount

valuation of Touchstone's mortgage; (5) the seemingly arbitrary gerrymandering of the PILOT Class into a separate class; and (6) the total unsecured debt, specifically why the Debtor's obligations to certain affiliated entities that had been written-off prior to the bankruptcy filing, were now included in the Unsecured Class.

On May 29, 2009, the Debtor filed an Objection to the Trustee Motion, which indicated that: (1) the Debtor had been successfully managed by Santobianco, the Board of Directors and a Chief Restructuring Officer, who had been appointed in September 2008, which resulted in increased occupancy and enabled the Debtor to pay its post-petition debts as they became due; (2) Touchstone's

---

and more than half in number of allowed claims of such class, application of paragraph (2) of this subsection; or

(ii) such holder does not have such recourse and such property is sold under section 363 of this title or is to be sold under the plan.

(B) A class of claims may not elect application of paragraph (2) of this subsection if—

(I) the interest on account of such claims of the holders of such claims in such property is of inconsequential value; or

(ii) the holder of a claim of such class has recourse against the debtor on account of such claim and such property is sold under section 363 of this title or is to be sold under the plan.

(2) If such an election is made, then notwithstanding section 506 (a) of this title, such claim is a secured claim to the extent that such claim is allowed.

11 U.S.C. § 1111(b).

**Page 9**

personnel had not provided any suggestions on how to reduce the cost of the Debtor's shared services; (3) the obligations due to the non-debtor Bethany Entities were reinstated based upon an auditor's assessment of the Debtor's ability to pay the obligations, whereas previously they had been deemed uncollectible; and (4) Touchstone could not meet its burden to demonstrate cause for the appointment of a Trustee based upon issues that could have been raised immediately after the filing, since it worked with the Debtor for more than eight months since the filing of its petition.

On May 29, 2009, the non-debtor Bethany Entities that had provided shared services and had advanced funds to the Debtor, also filed an Objection to the Trustee Motion, which largely mirrored the Debtor's Objection.

On June 2, 2009, Touchstone filed a Motion to Allow the Timely Submission of a Proof of Claim That Will be Deemed a Timely Filed Claim in the Bankruptcy (the "Bar Date Motion"). Touchstone alleged that it did not file a timely proof of claim by the April 30, 2009 bar date because Touchstone and its attorneys did not receive notice of this Court's March 19, 2009 Order fixing the bar date (the "Bar Date Order"). Touchstone further asserted that the Debtor would not be prejudiced by allowing Touchstone to file a claim that would be deemed timely, because: (1) the Debtor scheduled Touchstone on Schedule D for secured claims, and identified the secured claim therein at $19,017,751.09; (2)

Touchstone's claim was deemed filed pursuant to Section 1111, because the Debtor did not schedule the claim as disputed, contingent, or unliquidated; and (3) the Debtor stated in its Motion for Emergency Order Authorizing Limited Use of Cash Collateral filed on September 29, 2008 (the "Cash Collateral Motion")[10] and Stipulation Authorizing the Use of Cash Collateral Granting Adequate Protections, filed on February 25, 2009 (the "Cash Collateral Stipulation") that the Debtor was indebted to Touchstone in the amounts of $19,200,000.00 and $19,017,751.59, respectively.

On June 10, 2009, Touchstone also filed a Motion to Lift the Stay Under Section 362(d)[11] (the "Lift Stay Motion"), which alleged

---

[10]     On September 29, 2008, the Debtor filed a Motion for Emergency Order: (1) Authorizing Limited Use of Cash Collateral Pursuant to 11 U.S.C. § 363 and Providing Adequate Protection Pursuant to §§ 11 U.S.C. 361, 363 and 364; and (2) Scheduling Interim and Final Hearings Pursuant to Bankruptcy Rule 4001(b), which was originally heard by the Court on October 30, 2008 and tracked and adjourned numerous times for continued consideration of the Debtor's use of cash collateral.

[11]     Section 362(d) provides, in part, that:

    (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

        (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;

        (2) with respect to a stay of an act against property under subsection (a) of this section, if—

            (A) the debtor does not have an equity in such property; and

            (B) such property is not necessary to an effective reorganization;

11 U.S.C. § 362 (2009).

that as of November 19, 2008, the date that the Cash Collateral Stipulation was entered, the Debtor was indebted to Touchstone: (1) for the outstanding principal balance due under the Mortgage[12] in the amount of $19,017,751.59, plus all accrued and unpaid interest payable under the Mortgage; (2) for all fees, expenses, and other amounts payable under the Mortgage, Security Agreement and Loan Agreement (collectively the "Loan Documents"); and (3) for Touchstone's interest in pre and post-petition cash collateral.

In support of the Lift Stay Motion, Touchstone alleged that: (1) the Debtor conceded in its Cash Collateral Stipulation that it had no equity in the Property; (2) the Property constituted a "single asset real estate" under Section 101(51B),[13] and the Debtor

---

[12] The Debtor executed a mortgage note with Century Health Capital, Inc. ("Century") dated August 26, 1999, secured by a first position mortgage lien covering the real property on which the Debtor's facility was constructed (the "Mortgage"). The Debtor also executed an August 26, 1999 security agreement with Century, granting Century a security interest and lien in all of the Debtor's personal property assets (the "Security Agreement"). In conjunction with the Mortgage and Security Agreement, the Debtor and Century entered into a loan agreement (the "Loan Agreement"), wherein Century used proceeds of bonds, issued on August 1, 1999 by Manufacturers and Traders Trust Company, to finance the construction of the Debtor's facility, and the mortgage loan was insured by the Federal Housing Administration/United States Department of Housing and Urban Development ("HUD"). When the Debtor defaulted in approximately May, 2007 Century called the Loan Documents, which were then assigned to HUD, the Bonds were paid in full, and on February 28, 2008, HUD sold the Loan Documents to TS7-C Grantor Trust, who contracted Touchstone Asset Management, LLC n/k/a ValStone Asset Management, LLC (previously defined herein as "Touchstone").

[13] Section 101(51B) provides that:

(51B) The term "single asset real estate" means real property constituting a single property or project, other than residential real property with fewer than 4 residential units, which generates substantially all of the gross income of a debtor who is not a family farmer and on which no substantial business is being conducted by a debtor other than the business of operating the real property and activities incidental.

11 U.S.C. § 101 (2009).

failed to file its Plan within ninety days of filing of its petition, as required under Section 362(d)(3)(A),[14] and to commence monthly payments, as required by Section 362(d)(3)(B);[15] and (3) the

---

[14]     Section 362(d)(3)(A) provides that:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(3) with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief (or such later date as the court may determine for cause by order entered within that 90-day period) or 30 days after the court determines that the debtor is subject to this paragraph, whichever is later—

(A) the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time[.]

11 U.S.C. § 362 (2009).


[15]     Section 362(d)(3)(B) provides that:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

(3) with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief (or such later date as the court may determine for cause by order entered within that 90-day period) or 30 days after the court determines that the debtor is subject to this paragraph, whichever is later—

(B) the debtor has commenced monthly payments that—

(I) may, in the debtor's sole discretion, notwithstanding section 363(c)(2), be made from rents or other income generated before, on, or after the date of the commencement of the case by or from the property to each creditor whose claim is

Property was not necessary to an effective reorganization, because the Plan did not have a reasonable possibility of being confirmed because: (a) based upon the Debtor's proposed treatment of Touchstone in the Plan, Touchstone, which would control two-thirds of the Unsecured Class, would not vote for the Plan; (b) in anticipation of Touchstone's negative vote and objection, the Debtor had arbitrarily gerrymandered the PILOT Class, by proposing to pay the PILOT Class in three equal annual installments, rather than as an executory contract, which would be required to be assumed and cured; and (c) if the PILOT Agreement was not an executory contract, exercising its rights under the Mortgage, Touchstone would make a protective advance, fully repaying the PILOT Agreement debt.

On June 12, 2009, the Debtor filed an Objection to the Bar Date Motion, which alleged that: (1) Touchstone's counsel received notice of the Bar Date Order, which included being served with the Bar Date Order; (2) Schedule D set forth the value of Touchstone's secured claim at $5,000,000.00, with an unsecured portion of

secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien); and

(ii) are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate; or

11 U.S.C. § 362 (2009).

$14,017,751.59; (3) pursuant to Rule 3003(c)(4),[16] if Touchstone disagreed with the Debtor's scheduling of its claim, it was required to timely file a proof of claim pursuant to the Bar Date Order; and (4) Touchstone did not demonstrate that its failure to timely file a proof of claim was due to excusable neglect, and therefore, Touchstone should not be permitted to file a proof of claim that would be deemed timely.

On June 15, 2009, Touchstone filed a Reply Memorandum of Law in Support of its Bar Date Motion, which stated that pursuant to J.E. Livestock, Inc. v. Wells Fargo, 375 B.R. 892, 896 (B.A.P. 10th Cir. 2007), the valuation asserted in Schedule D did not fix the value of the collateral for purposes of an allowed secured claim.

The Court set a hearing on the Bar Date Motion for June 17, 2009.[17]

---

[16]     Rule 3003. Filing Proof of Claim or Equity Security Interest in Chapter 9 Municipality or Chapter 11 Reorganization Cases

(c) Filing proof of claim.

(4) Effect of filing claim or interest. A proof of claim or interest executed and filed in accordance with this subdivision shall supersede any scheduling of that claim or interest pursuant to § 521(a)(1) of the Code.

F.R.B.P. Rule 3003 (2009).

[17]     On June 16, 2009, the Debtor filed proposed black-lined revisions to the Plan and Disclosure Statement (the "Amended Plan" and "Amended Disclosure Statement"), which indicated that the appraised value of $6,000,000.00 contained in the Debtor's Plan and Disclosure Statement and Amended Plan and Amended Disclosure Statement (collectively, for purposes of this Decision & Order, the "Plan" and "Disclosure Statement") was undisputed due to Touchstone's failure to file proof of its secured claim prior to the April 30, 2009 claim's bar date. On June 22, 2009, Touchstone filed an Objection to the Debtor's Amended Plan and Amended Disclosure Statement, wherein Touchstone contested that the value of the Property is set due to Touchstone's failure to file a proof of claim, and largely included the same allegations as contained in its Objection to the Debtor's Plan and Disclosure Statement, dated May 27, 2009, as well as its Trustee Motion and Lift Stay Motion.

On June 17, 2009, the Court denied the Bar Date Motion without prejudice, because the Court determined that Touchstone received proper notice of the Bar Date Order. The Court denied the Bar Date Motion without prejudice to Touchstone bringing a motion to establish that Touchstone had a timely filed claim or should be permitted to file a proof of claim that would be deemed timely, based upon grounds other than insufficient notice of the Bar Date Order, including that Touchstone should be deemed to have filed an informal proof of claim. The Court also orally ruled that Section 1111(a)[18] does not preclude the Court from exercising its discretion under Section 506(a)(1)[19] to determine the amount of a creditor's allowed secured claim based upon the value of the collateral.

---

[18]     Section 1111(a) provides that:

(a) A proof of claim or interest is deemed filed under section 501 of this title for any claim or interest that appears in the schedules filed under section 521 (1) or 1106 (a)(2) of this title, except a claim or interest that is scheduled as disputed, contingent, or unliquidated.

11 U.S.C. § 1111 (2009).

[19]     Section 506(a)(1) provides that:

(a)

(1) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

11 U.S.C. Section 506 (2009).

Hearings on the Disclosure Statement and the Cash Collateral Motion were held on May 28, 2009 and June 3, 2009, and were further adjourned to June 17, 2009. The Trustee Motion was also heard on June 3, 2009 and adjourned to June 17, 2009, when all of the matters were further adjourned to June 24, 2009.

On June 19, 2009, the Debtor filed an Objection to the Lift Stay Motion. The Debtor conceded in the Objection that there was no equity in the Property, but it indicated that: (1) Touchstone did not assert a lack of adequate protection, and in fact, the Debtor had paid more than $360,000.00 to Touchstone since filing its petition; (2) the Property was necessary to an effective reorganization; (3) the Debtor was not required at the time of a Disclosure Statement hearing to show that its Plan could be confirmed because it was not patently unconfirmable, and Touchstone had not met its burden to demonstrate that the Debtor did not establish a reasonable possibility of a successful reorganization; (4) the Debtor scheduled the PILOT Agreement on Schedule G, for executory contracts or leases, solely as a precaution; (5) the economic realities of the transactions creating the PILOT Agreement demonstrate that it is not an executory contract or lease; (6) Touchstone's Mortgage only provided that Touchstone could advance taxes, assessments and water rates, so Touchstone had no authority to pay the PILOT Class obligations; and (7) this was not a single asset real estate case under Section 101(51B), because the Debtor

**Page 17**

did not obtain all of its revenue from a passive investment in real property; it also obtained income from other active commercial endeavors and from the use of its employees for other income-producing services.

On June 22, 2009, Touchstone filed a Motion to Value its Allowed Secured Claim Pursuant to Section 506 (the "Motion to Value Security"), wherein Touchstone argued that although it did not file a proof of claim and the Court denied the Bar Date Motion without prejudice, Touchstone has an allowed secured claim in excess of the Debtor's scheduled amounts because: (1) Schedule D of the petition provided that Touchstone had a non-contingent, liquidated and undisputed secured claim under Section 1111(a) in the amount of $19,017,751.59, and, therefore, Touchstone held a secured claim in that amount; (2) the Debtor's cash collateral orders constituted an informal proof of claim; (3) the Debtor conceded in numerous pleadings, including the Debtor's cash collateral orders, that Touchstone asserted a secured claim in excess of $19,000,000.00; and (4) a debtor's schedules cannot bind a secured creditor for purposes of valuation under Section 506(a). The Motion to Value Security was scheduled for a hearing on September 16, 2009.

On June 22, 2009, Touchstone also filed a Motion For Extension of Time to Exercise its Section 1111(b) Election Under Rule 3014 (the "Motion for 1111(b) Election"). Touchstone requested that the Court extend its time to make a Section 1111(b) election until five

**Page 18**

days after the Court entered an order determining the value of Touchstone's secured claim pursuant to its Motion to Value Security, or at another time to be set by the Court. Touchstone asserted that where the parties did not agree on the value of Touchstone's secured claim, it could not be set by the Debtor's scheduled value, but rather, only by the Court under Section 506(a) after an evidentiary hearing. The Motion for 1111(b) Election was scheduled for September 16, 2009.

On June 24, 2009, the Court denied the Trustee Motion. The Court determined that Touchstone had not met its burden to demonstrate that a Trustee should be appointed for cause under Section 1104(a)(1), or in the best interests of creditors under Section 1104(a)(2). Among the reasons given by the Court was that a Chief Restructuring Officer was involved in the management of the Debtor.

On June 24, 2009, the Court also considered Touchstone's Lift Stay Motion and determined that since the Debtor conceded that there was no equity in the Property, the Debtor and Touchstone should submit further pleadings, addressing the second prong required under Section 362(d), which is whether the Property is necessary to an effective reorganization. Specifically, the Court requested that the parties address whether the Plan was patently unconfirmable because of the Debtor's treatment of the PILOT Agreement arrears as a separate class under the Plan. Accordingly,

**Page 19**

the Court denied the approval of the Disclosure Statement on an interim basis, and it adjourned the hearings on the Disclosure Statement and the Lift Stay Motion to September 16, 2009, along with the Cash Collateral Motion.

On June 24, 2009, the Debtor filed a Memorandum of Law in Support of Claim Classification Structure Contained in the Plan, and on August 21, 2009, a Reply to Touchstone's pleadings in support of the Lift Stay Motion. The Debtor reiterated its prior allegations against the Lift Stay Motion and further alleged that: (1) Touchstone did not have standing to challenge the classification of the PILOT Class because it does not hold a PILOT Class claim and was not a member of the PILOT Class; (2) the PILOT Agreement was not a separate and independent agreement between the Debtor and IDA, but rather was part of a comprehensive financing agreement that is not an executory contract that can be rejected under Section 365(a)[20] because: (a) real property tax relief in the form of the PILOT Agreement or other arrangement was contemplated by the parties to the 1999 bond financing agreement to construct the Property, however, the PILOT Agreement was not executed until

---

[20]    Section 365(a) provides that:

(a) Except as provided in sections 765 and 766 of this title and in subsections (b), (c), and (d) of this section, the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor.

11 U.S.C. § 365 (2009).

2001 because the tax relief was not needed until the Property was completed in 2001; and (b) the IDA's continuation of the Debtor's tax-exempt status is not a material ongoing obligation because it could only be granted once, when the PILOT Agreement was executed in May 2001; (3) other courts have found that lease agreements related to PILOT agreements and IDA transactions are not true leases subject to Section 365; (4) the requirements of Section 1122(a) speak only to the types of claims that can be classified together, but it does not address whether substantially similar claims may be classified separately; (5) the Debtor had met its burden to demonstrate "a legitimate reason for segregating substantially similar claims in different classes" under <u>Boston Post Road Limited Partnership v. Federal Deposit Insurance Corporation</u>, 21 F.3d 477, 483 (2nd Cir. 1994) ("<u>Boston Post Road</u>"), because the courts have permitted the separate classification of a claimant that holds non-creditor interests where: (a) there is evidence that the claimant will vote its claim based upon its non-creditor interests in the case, instead of its economic interest as a creditor; and (b) the relationship is sufficiently independent of the debtor/creditor relationship arising out of the claim, and is real and ongoing, so that the non-creditor aspect of the relationship will likely play a significant role in the success of the reorganization; (6) the Debtor is in conformance with the decision in <u>Boston Post Road</u> and other similar cases, where the

**Page 21**

courts required that unsecured deficiency claims of secured
creditors be classified with other general unsecured creditors,
because the Debtor has scheduled Touchstone's unsecured deficiency
with the Unsecured Class; (7) the Debtor's separate classification
of the PILOT Agreement was appropriately based upon the non-
creditor aspects of the PILOT Agreement because: (a) the PILOT
Agreement is a financial subsidy providing additional capital that
is necessary to the Debtor's reorganization, without which the
Debtor would pay $237,000.00 in real estate taxes, instead of the
approximately $112,000.00 per year that the Debtor has been paying;
(b) upon an event of default, the IDA may return the Property to
the regular tax rolls; (c) the IDA entered into the PILOT Agreement
in order to promote job opportunities and economic prosperity in
Chemung County; and (d) the Property is important to numerous
community organizations who use it for meetings and programs; and
(8) Touchstone did not perform its due diligence in determining the
true value of the Property and now faces a significant cram-down of
the value of its Mortgage, but it nevertheless inappropriately
seeks to improperly leverage its unsecured deficiency claim in
order to control the Unsecured Class and undermine the Plan.

On July 24, 2009, Touchstone filed a Supplemental Memorandum
in Support of its Motion to Lift Stay and on August 25, 2009, it
filed a Reply to the Debtor's Memorandum of Law in Support of Claim
Classification Structure Contained in the Plan.

In addressing the classification issues, Touchstone alleged that it had standing to object to the PILOT Class because it was adversely affected by the Debtor's proposed classifications and treatment of classes in the Plan. Touchstone also asserted that the PILOT Agreement was an executory contract because it is "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete the performance would constitute a material breach excusing the performance of the other" (the "Countryman Approach"). Vern Countryman, Executory Contracts in Bankruptcy: Part I, 57 Minn. L.Rev. 439, 460 (1973); South Chicago Disposal, Inc. v. LTV Steel Co., Inc. (In re Chateaugay Corp.), 130 B.R. 162, 164 (S.D.N.Y. 1991). Touchstone further alleged that the PILOT Agreement was an executory contract under the Functional Approach, which requires looking backward at the purposes to be accomplished by rejection, which, if accomplished, then the contract is not executory (the "Functional Approach"). Rieser v. the Dayton Country Club Co. (In re Magness), 972 F.2d 689, 693 (6th Cir. 1992); Cohen v. The Drexel Burnham Lambert Group, Inc., 138 B.R. 687, 707-709 (Bankr. S.D.N.Y. 1992).

Touchstone further asserted in connection with the classification issues, that the PILOT Agreement is an executory contract under the Functional Approach and Countryman Approach, because: (1) the PILOT Agreement is not linked to the original

**Page 23**

financing transaction, since the Debtor entered into the PILOT Agreement in May 2001, separate from the Debtor's mortgage financing obtained in 1999, and only after having been denied tax exempt status by the Internal Revenue Service; (2) the PILOT Agreement is a continuing obligation that was facilitated by sale-leaseback and lease-leaseback transactions with December 2006 maturity dates that were extended through 2011 pursuant to a February 2008 Amendment;[21] and (3) the PILOT Agreement is a long-term bargain with continuing duties, wherein: (a) the Debtor has a continuing duty to make payments under the PILOT Agreement; and (b) the IDA has a countervailing material obligation to keep the Debtor off its regular tax rolls until 2012, unless the Debtor defaults in making payments, whereupon the IDA could retract the Debtor's tax-exempt status.

Touchstone also alleged in its Supplement to the Lift Stay Motion that under <u>Boston Post Road</u>: (1) the Second Circuit, along with all of the Circuit Courts who have determined when similar claims may be classified separately, have held that similar claims may not be separately classified solely to engineer an assenting impaired class; (2) classifications designed to manipulate class voting must be carefully scrutinized by the court, and the debtor bears the burden to present credible proof of a legitimate reason

---

[21] The Court notes that in the Santobianco Affidavit, he indicates that the PILOT Agreement was renewed in November 2007 and was amended and renewed on February 29, 2008, and extends through December 31, 2011.

for segregating substantially similar claims in different classes; and (3) public policy dictates that approving a plan that seeks to disenfranchise the overwhelmingly largest creditor through artificial classification is inconsistent with the principles of the Bankruptcy Code.

On September 16, 2009, at a hearing on the Lift Stay Motion, the Court orally ruled that: (1) Touchstone had standing as an interested party to contest the Debtor's classification which could adversely affect it; (2) the Debtor's case was not a single asset real estate case under Section 101(51B) because the Debtor did not obtain all of its revenue from passive investment in real property, but also obtained income from other services and through the use of its employees to provide services for its residents; and (3) the PILOT Agreement was not an executory contract under the Countryman Approach or the Functional Approach, because: (a) the Debtor was not bound by its Schedules, and the Debtor had indicated that it would amend its Schedule G to remove the PILOT Agreement; (b) upon a default by the Debtor in making its PILOT Agreement payments, the IDA could place the Debtor back on the regular tax rolls; (c) there was no substantial performance required by the IDA under the PILOT Agreement since the Debtor's tax-exempt status would continue as long as it made the required payments; and (d) it was apparent that some type of tax relief was contemplated in the initial financing

of the Property in 1999, thereby making the PILOT Agreement part of the financing contemplated for the Property as a whole.

The Court reserved decision on the remaining determinative issue of whether the PILOT Class may be separately classified from the Unsecured Class.

On September 16, 2009, the Court also heard and ultimately adjourned until January 13, 2010, the Cash Collateral Motion, the hearing on the Disclosure Statement, the Motion to Value Security, the Motion for 1111(b) Election, and the Motion to Extend the Debtor's Exclusive Period to obtain Acceptances under Section 1121(d).

## DISCUSSION

### A.   The Lift Stay Motion

Touchstone moved for relief from the automatic stay under various subsections of Section 362(d):

#### 1.   Section 362(d)(3)

Section 362(d)(3) provides that the court shall grant relief from the stay with respect to an act against single asset real estate if the debtor has not met certain requirements, including filing a plan and commencing monthly payments. The Court confirms its prior oral ruling that the Debtor is not a single asset real estate debtor under Sections 362(d)(3) and 101(51B),

**Page 26**

because the Debtor obtains revenue from the services it provides to its residents and through the use of its employees to provide those services; it does not obtain all of its revenue from passive investment in real property.

### 2. <u>Section 362(d)(1)</u>

Section 362(d)(1) provides that the court shall grant relief from the automatic stay "for cause, including the lack of adequate protection of an interest in property of such party in interest[.]" Although Touchstone alleged in the Lift Stay Motion that "cause" existed under Section 362(d)(1), the Court finds that it has not met its burden to demonstrate such cause. The Debtor paid Touchstone more than $360,000.00 from the filing of its petition through the filing of the Lift Stay Motion, which constitutes adequate protection, and Touchstone has not established any other cause under Section 362(d)(1) to the Court's satisfaction.

### 3. <u>Section 362(d)(2)</u>

The Debtor has acknowledged that it has no equity in the Property under Section 362(d)(2)(a),[22] and the parties have agreed, at oral argument and in their pleadings, that the issues for this

---

[22] In fact, the Debtor's Plan proposes to cram-down the value of the Property into a secured and an unsecured portion.

Court to determine are: (1) whether the Property is necessary to an effective reorganization under Section 362(a)(2)(B); and (2) whether the Debtor's Plan is patently unconfirmable, because it improperly classifies the PILOT Class as a separate class, and no other Plan that the Debtor could propose under Section 1129 could be confirmed without the consent of Touchstone.

**B.    Necessary for an Effective Reorganization**

    **1.    The Provisions of the Debtor's Plan and Statutory Requirements**

The Court once again confirms its oral ruling that Touchstone does have standing to contest the Debtor's classification of the PILOT Class, because Touchstone could be adversely affected by that classification.

The Debtor's Plan provides for an impaired Unsecured Class that includes an unsecured deficiency claim for Touchstone, which the Debtor scheduled at $14,017,751.59. While Touchstone objected to the Debtor's valuation of the Property at $5,000,000.00 and the resulting alleged unsecured deficiency claim, it is undisputed that: (1) Touchstone controls the vote of the Unsecured Class; and (2) Touchstone has indicated that it will vote against the Plan.

The Debtor's Plan also provides for an impaired PILOT Class, and an impaired Secured Class, of which Touchstone is the sole

member.  Touchstone has also indicated that as the sole member of the Secured Class it will vote against the Plan.

As a result of these anticipated votes by Touchstone in the Unsecured and Secured Classes, the Debtor's Plan cannot be confirmed under Section 1129(a)(8),[23] which requires that each impaired class vote in favor of a plan.  Accordingly, the Debtor's Plan may only be confirmed, if at all, under Sections 1129(a)(10),[24] and 1129(b).[25]  These sections require that:  (1) at least one

---

[23]    Section 1129(a)(8) provides that:

(a) The court shall confirm a plan only if all of the following requirements are met:

(8) With respect to each class of claims or interests -

(A) such class has accepted the plan; or

(B) such class is not impaired under the plan.

11 U.S.C. § 1129 (2009).

[24]    Section 1129(a)(10) provides that:

(a) The court shall confirm a plan only if all of the following requirements are met:

(10) If a class of claims is impaired under the plan, at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider.

11 U.S.C. § 1129 (2009).

[25]    Section 1129(b)(1) provides that:

(b)
(1) Notwithstanding section 510(a) of this title, if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is

**Page 29**

impaired class votes in favor of the plan; (2) all the requirements of Section 1129(a) are satisfied, except for Section 1129(a)(8); and (3) under Sections 1129(b)(1) and (2), that the plan does not discriminate unfairly and is fair and equitable with respect to the impaired classes that have not accepted the plan.

### 2. <u>**Is the PILOT Agreement Claim an Executory Contract**</u>?

If the PILOT Agreement is an executory contract, as Touchstone has alleged, then it may be assumed or rejected under Section 365(a). If rejected, the PILOT Agreement arrears would be an unsecured claim that would be included in the Unsecured Class and those arrears could not constitute the separate class proposed by the Debtor. If assumed, the PILOT Agreement arrears would be required to be paid as part of the cure required by Section

---

impaired under, and has not accepted, the plan.
11 U.S.C. § 1129 (2009).

365(b).[26] This would also eliminate the PILOT Class proposed by the Debtor.

The Court once again confirms its oral ruling that the PILOT Agreement is not an executory contract under either the Countryman Approach, which the Court generally follows and specifically believes is the most appropriate test to employ under these facts and circumstances, where the dispute does not even involve the other party to the contract; or the Functional Approach, for the reasons previously stated on the record and in this Decision & Order, and also because: (1) similar to <u>Colombia County Industrial Development Agency v. Hudson Valley Care Centers</u>, 2007 WL 2261585 (N.D.N.Y. 2007), the benefit of the PILOT Agreement tax exemption here was granted years ago in 2001 when the parties executed the PILOT Agreement; (2) the tax exemption is automatic and stems from the IDA's retention of the leasehold interest in the Property under the lease-leaseback agreement; (3) the only material obligation that exists is the Debtor's obligation to make payments;

---

[26]      Section 365(b) provides that:

(b)

> (1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

> > (A) cures, or provides adequate assurance that the trustee will promptly cure...

11 U.S.C. § 365 (2009).

(4) the preservation of the Debtor's tax-exempt status by the IDA is not a material obligation, nor does the IDA have any material obligation under the PILOT Agreement; and (5) the purposes for the creation of the PILOT Agreement have been accomplished, therefore it is not executory.[27]

### 3.   <u>Can the PILOT Agreement Claim be Separately Classified</u>?

The Court holds that the PILOT Agreement Claim cannot be separately classified, but must be included in the Unsecured Class.

Section 1122(a) provides that: "[e]xcept as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class."  The Second Circuit noted in <u>Boston Post Road</u> that, while Section 1122(a) prohibits the classification of dissimilar claims in the same class, "[a]ll the circuit courts that have heretofore

---

[27]     While the additional issue of the applicability of Section 365 to the lease-leaseback agreement for the Property, entered into between the Debtor and the IDA, was not a focus of the Debtor's and Touchstone's arguments, in order to address each of the issues raised, this Court holds that the lease-leaseback agreement is not an unexpired lease under Section 365 but rather, is not a true lease per <u>Hotel Syracuse, Inc. v. City of Syracuse Industrial Development Agency</u> 155 B.R. 824, 842 (Bankr. N.D.N.Y. 1993), and was created in order to facilitate the Debtor's tax assistance.

Further, Touchstone alleged that it was entitled to make a protective advance of the PILOT Agreement arrears on the Debtor's behalf based upon its Mortgage.  However, Touchstone sought this relief only if the Court held that the PILOT Agreement was not an executory contract and that the Debtor's classification of the PILOT Class was proper.  Since this Court holds herein that the classification of the PILOT Class is improper, the Court need not address the question of whether Touchstone is entitled to make a protective advance of the PILOT Agreement arrears.

visited the question of when similar claims may be classified separately have held that similar claims may not be separately classified solely to engineer an assenting impaired class[.]" The Second Circuit held that the classification of "substantially similar" claims in different classes may only be undertaken for reasons independent of the Debtor's motivation to secure the vote of an impaired assenting class of claims. Boston Post Road at 482. Classifications designed to manipulate class voting must be carefully scrutinized since there is potential for abuse when the debtor may classify claims to insure that at least one class of impaired creditors vote for the plan, thereby making it eligible for cram-down. Boston Post Road at 482. Further, the approval of a plan that seeks to disenfranchise the overwhelmingly largest creditor through artificial classification is inconsistent with the principles of the Bankruptcy Code, including that creditors holding larger debt should have a comparably greater voice in reorganization. Boston Post Road at 483.

This Court holds that the Debtor's classification of the PILOT Class violates Section 1122(a), Section 1129(b)(1) and Boston Post Road, as an impermissible gerrymandering of an impaired assenting class as well as an inequitable and discriminatory classification, because: (1) this Court believes that, even though there may exist some reasons to separately classify a claim, nevertheless if, on the facts and circumstances presented, that

**Page 33**

classification inequitably disenfranchises the largest creditor,
which should equitably control the vote on the reorganization plan,
it is not impermissible for a Court to deny such a separate
classification, in order to comply with the holding and spirit of
the decision in <u>Boston Post Road</u> and the anti-discrimination
provisions of Sections 1129(a)(10) and 1129(b)(1); (2) the Court
believes the proposed classification is inequitable and
discriminatory, because the PILOT Agreement only lasts through
2011, so that the fundamental economics are that the Debtor is
proposing to disenfranchise Touchstone, preventing it from
exercising its foreclosure rights which might allow it to
ultimately recover significantly more than the Debtor proposes,
which is to pay it 5% of its approximately $14,000,00.00 deficiency
over time, so that the Debtor can pay approximately $170,000.00
under the Plan in order to save $250,000.00[28] in taxes in 2010 and
2011, a net $80,000.00 savings, which should not drive and
determine a non-consensual reorganization; (3) while the Court
recognizes that if the Debtor had been able to negotiate a
consensual plan, then the interested parties and the Court might
have permitted the Debtor to separately classify the PILOT Class,
as proposed in the Plan, or even as an executory contract to be

---

[28]    In the Santobianco Affidavit, he states that the Debtor pays
$112,000.00 annually under the PILOT Agreement, and would pay $237,000.00
annually if the Debtor was on the regular tax rolls, making the Debtor's annual
savings $125,000.00, or $250,000.00 for the remainder of the PILOT Agreement.

**Page 34**

cured by deferred payments, because all parties might have agreed that it would benefit the Debtor in the implementation of a plan, but in the present case, the Plan is a cram-down plan; (4) the Court is concerned that the Debtor could have been current under the PILOT Agreement at the time of filing with proper pre-bankruptcy planning, and believes that allowing PILOT Agreements to be a permissible and easy pre-bankruptcy Chapter 11 Section 1129(a)(10) planning tool would be a dangerous precedent; (5) the term of the PILOT Agreement, which is effective only through 2011, should not be dispositive under Section 1129(a)(10), because there is no guaranty that the PILOT Agreement will even be in existence for the greater part of the Plan, which, if confirmed would commence only in 2010, and then run for ten (10) years; and (6) as set forth in more detail below in this Decision & Order, the Debtor has failed to meet its burden to demonstrate that the PILOT Agreement arrearages should not be classified as an unsecured claim because of the non-creditor interests present here.

The Debtor has also alleged that it has demonstrated "credible proof of a legitimate reason for separate classification of similar claims" under Boston Post Road, through its allegations of non-creditor interests, which have been considered by a number of courts, which have noted that: (1) separate classification may be permitted where a claimant would vote based upon its non-creditor interests rather than its economic interest as a creditor,

under In re The Heritage Organization, LLC, 375 B.R. 230, 304 (Bankr. N.D. Tex. 2007); (2) pursuant to Heartland Federal Savings & Loan Association v. Briscoe Enterprises, Ltd., II, 994 F.2d 1160 (5th Cir. 1993) ("Heartland"), a non-creditor relationship, with continuing contributions and interests can make the creditor distinct from other trade creditors; and (3) a debtor's alleged business justification for the separate classification of substantially similar claims must be both independent of the debtor/creditor relationship and ongoing, such that the relationship will likely play a significant role the Debtor's viability or the success of the reorganization, under In re WBA Associates Limited Dividend Housing Association Limited Partnership, 224 B.R. 40, 43-44 (Bankr. E.D. Mich. 1998).

This Court holds that, on the facts and circumstances of this case, the Debtor has not produced credible proof of a legitimate reason for separate classification of similar claims based upon non-creditor interests since, even if, as the Debtor alleged, non-creditor interests existed, including employment, and providing a senior housing and community programming facility, they do not constitute sufficient reasons for the separate classification because: (1) the Property will likely be operated in substantially the same form as it is at present, because: (a) as represented by Touchstone, Touchstone may manage the property, since its business includes the management of senior living facilities; or (b) the

**Page 36**

Property will be sold at foreclosure, but either way, the same non-creditor interests will be served, albeit by a for-profit or another not-for-profit entity; (2) the business justification of the tax benefit received by the Debtor from Chemung through the PILOT Agreement is not ongoing for the proposed term of the Plan, since it was originally set to expire in 2007, was renewed, and is now scheduled to run through 2011, and the Plan and Disclosure Statement do not provide for further renewal of the PILOT Agreement;[29] (3) unlike in <u>Heartland</u>, because the Agreement does not continue beyond 2011, it is not essential to the Debtor's continued operations and reorganization; and (4) the Debtor's desire to solidify its relationship with the IDA, because of the IDA's ability to return the Debtor to the regular tax rolls upon the Debtor's default, is not a legitimate reason to separately classify the PILOT Class, and in fact, if the Debtor paid regular taxes, it would create additional revenue for Chemung County to pursue its non-creditor interests.

It may be that this not-for-profit Debtor is the best entity to operate this Property and business as part of Bethany Village. However, when its construction and business plan projections were not met, unfortunately HUD abandoned it. That unfortunate

---

[29]    The Santobianco Affidavit, which indicates that he "[is] advised that the IDA and other PILOT Claimants are willing to consider extending the terms of the PILOT Agreement beyond December 31, 2011, under certain circumstances" is insufficient proof that the PILOT Agreement is ongoing or will be extended.

**Page 37**

abandonment is what has put the Debtor in its current position, which might easily have been anticipated when HUD sold its mortgage to Touchstone.

## CONCLUSION

The Lift Stay Motion is granted under Section 362(d)(2), because the Debtor does not have equity in the Property, and because the Property is not necessary to an effective reorganization due to the Debtor's impermissible classification of the PILOT Class in its Plan.

The stay shall terminate on January 27, 2010, in order to afford the parties one last opportunity to negotiate a consensual plan.

**IT IS SO ORDERED.**

_____/s/_____
**HON. JOHN C. NINFO, II**
**U.S. BANKRUPTCY JUDGE**

**Dated:  January 12, 2010**